TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2426
     Facsimile: (213) 894-0142
     E-mail:   Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 8:21-cv-1255 |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6) |
| $383,960.00 IN U.S. CURRENCY, $218,937.33 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER ENDING '5501, AND $129,437.94 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER ENDING '9165, | [H.S.I. and I.R.S.] |
| Defendants. | |

The United States of America brings this claim against the defendants identified below, and alleges as follows:

**JURISDICTION AND VENUE**

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6).

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this District pursuant to 28 U.S.C. § 1395(a).

**PERSONS AND ENTITIES**

4. The plaintiff is the United States of America ("plaintiff" or the "government").

5. The defendants (hereinafter the "Defendant Assets") are:

   a. $383,960.00 in U.S. Currency, seized by California Highway Patrol ("CHP") officers on November 9, 2021, during a vehicle search of Ian Silva ("Silva");

   b. $218,937.33 in funds seized from Bank of America account number ending '5501 (the "'5501 Account"), held in the name of Ocean View Accounting, Inc.; and

   c. $129,437.94 in funds seized from Bank of America account number ending '9165 (the "9165 Account"), held in the name of Long Beach Auto Detail.

6. The Defendant Assets are currently in the custody of the Internal Revenue Service, or the United States Marshals Service in this District, where they shall remain subject to this Court's jurisdiction pending this action.

7. The interests of Silva and John Goldberg ("Goldberg"), may be adversely affected by these proceedings.

**EVIDENCE SUPPORTING FORFEITURE**

*Background*

8. Marijuana is legal, but regulated, in the State of California. Marijuana remains a federally-controlled drug pursuant to Schedule I of the Controlled Substances Act.

9. Because marijuana remain illegal federally, both legal and illegal marijuana dispensaries in California primarily transact in cash, rather than through direct or electronic banking transactions. Because transactions for marijuana in California (both legal and illegal) occur primarily in cash, marijuana dispensaries often have automated teller machines ("ATMs") present in the dispensaries for customers to obtain cash for their marijuana transactions.

10. ATMs generally allow users to receive cash rapidly in exchange for a corresponding debit to the user's bank account, without requiring the user to physically visit their bank for the transaction. Specifically, a user enters their banking information and requested amount of cash, and the ATM electronically contacts an ATM exchange network, which queries the user's bank to assess the user's available funds. Should sufficient funds be available according to the user's bank, the ATM dispenses cash to the user and arranges an electronic settlement of the corresponding amount to an account designated by the ATM's operator. ATMs often charge a fee for these transactions in addition to the value of cash dispensed, which makes the transaction profitable for the ATM operator. For this reason, a $100 withdrawal from an ATM may be associated with a $103 debit to the user's associated bank account.

11. Because ATMs dispense cash, but often do not accept deposits of cash, they require a regular supply of new cash to

1 operate. In addition, ATMs typically require cash in small
2 denominations (or example, $20 bills), because users will often want
3 to withdraw amount less than $100 or which are not multiples of $100.

4     12. Many ATMs are associated with banks or other financial
5 institutions and derive cash for their operations from those same
6 entities ("Bank-Owned ATMs"). Not all ATMs are owned or controlled by
7 financial institutions, however, and some privately-owned ATMs are
8 operated by non-banks ("Private ATMs"). These Private ATMs require a
9 steady stream of currency to operate, but unlike Bank-Owned ATMs,
10 they lack the cash reserves of a bank or financial institution to
11 draw on.

12     13. Because Private ATMs require a constant supply of cash, and
13 because they functionally exchange cash for electronic funds, Private
14 ATMs are a popular mechanism for laundering the proceeds of crime,
15 and specifically, the proceeds of narcotics trafficking.

16     14. Criminal organizations which operate primarily in cash will
17 stock Private ATMs with tainted cash, including narcotics proceeds,
18 which unwitting users convert into debits from their banks accounts,
19 which can then be paid into bank accounts identified by the criminal
20 organization, sometimes in the names of third parties, and with no
21 visible connection to drug trafficking.

22     15. The Federal Financial Institutions Examination Council
23 ("FFIEC"), a formal interagency body empowered to prescribe uniform
24 principles, standards, and reports on federal examination of
25 financial institutions for financial regulators including the Board
26 of Governors of the Federal Reserve System and the Office of the
27 Comptroller of the Currency, has recognized that "Privately owned
28 ATMs are particularly susceptible to money laundering and fraud" and

that "[m]oney laundering can occur through privately owned ATMs when an ATM is replenished with illicit currency that is subsequently withdrawn by legitimate customers. This process results in ACH deposits to the [ATM operator's] account that appear as legitimate business transactions. Consequently, all three phases of money laundering (placement, layering, and integration) can occur simultaneously."

### *Silva And Goldberg's Money Laundering Scheme*

16. Silva and Dianne Evans ("Evans") operate a network of 30-40 Private ATMs in the Southern California area under the business name Money Man ATMs. Silva's Private ATMs are primarily located in marijuana dispensaries, including marijuana dispensaries which are unlicensed and illegal under California law (and virtually all marijuana dispensaries remain illegal under federal law).

17. To support the operation of his Private ATMs, Silva required a regular supply of cash, which he was unable to obtain from banks. To obtain this cash to operate his Private ATMs, Silva entered an agreement to receive large quantities of cash from Goldberg, which Silva would return to Goldberg electronically, after the cash had been exchanged for account debits through ATM exchanges.

18. Goldberg is a Long Beach, California based tax preparer.

19. To facilitate this arrangement, in or about October of 2020, Silva began linking his Private ATMs directly to Goldberg's bank accounts, including the '9165 Account. Silva would also transfer funds from the '9165 Account to the '5501 Account. As a result, Goldberg's account would directly receive funds associated with withdrawals from Silva's ATMs, where were in turn stocked with cash provided by Goldberg.

5

20. Both Goldberg and Silva knew that the cash Goldberg provided to Silva to stock the Private ATMs was sourced from illegal narcotics sales, including from the sale of marijuana. In addition, both Goldberg and Silva knew that the cash Goldberg provided to Silva to stock the Private ATMs was intended to be used primarily to facilitate sales at marijuana dispensaries.

*Silva and Goldberg Discussed the Scheme on Intercepted Calls*

21. On or about November 9, 2020, the Hon. Fernando M. Olguin authorized the interception of communications and geolocation data for phone number ending '0827 (the "Intercepted Phone"), believed to be used by Silva, until December 1, 2020.

22. On or about November 9, 2020, at 9:28 a.m., agents intercepted an audio phone call between Silva, using the Intercepted Phone, and phone number ending 2870, believed to be used by Goldberg. The following is an excerpt of that conversation:

SILVA: Hey, how much do you have? I just want to make sure I have the proper stuff. Like, if you have like, more than two hundred ($200,000)[1].

GOLDBERG: I do.

SILVA: Like are we talking four hundred ($400,000)

GOLDBERG: Um! I believe it was three eight three ($383,000) to be exact. I think I have… somehow, remember writing that before I for the weekend. Um, but good news bad news for you… um, I want to say one fifty ($150,000) is one hundred ($100 bill denomination).

---

[1] Interpreted coded language is included in parentheticals.

| | | |
|---|---|---|
| SILVA: | That's fine, cause I have like, uh, like, forty ($40,000) in large bills so that helps me to go see that guy and he gives me a little bit more. |
| GOLDBERG: | Okay. So, actually in terms of it'll fit, you know? Two hundred ($200,000) of its twenties and then like, one fifty ($150,000) is hundreds. |
| SILVA: | Okay. Um, I'll probably be at your office around one (1:00), twelve (12:00), one (1:00). Is that cool? |

23. On November 9, 2020, at 4:53 p.m., agents intercepted an audio phone call between Silva, using the Intercepted Phone and phone number ending 0914, believed to be used by witness B.D. Additionally, the call appears to be on speaker with Evans interjecting into the conversation. The following is an excerpt of that conversation:

| | |
|---|---|
| SILVA: | Yeah, I knew it too. It was all bad. I was like, "Dude I have all this fucking money." It was all bad. |
| B.D.: | Put that shit in your fucking trunk, dog. |
| SILVA: | They would've got it anyways, bro'. [BACKGROUND: EVANS: Yeah, but the small part probably smelled.] Dude, that two- two hundred and- t- two hundred thousand ($200,000) of it was from the growers. In their bags. [BACKGROUND: EVANS: So it smells just like weed.] |
| B.D.: | For sure. |
| SILVA: | [BACKGROUND: EVANS: Strong weed.] And that's why the dogs were going crazy, bro'. |

24. On November 9, 2020, at 11:55 a.m., agents intercepted an audio phone call between Silva, using the Intercepted Phone and his

7

brother, D. Silva, using phone number ending 6969. The following is an excerpt of that conversation:

Ian SILVA: Well, I checked Meta Bank, I checked one account today and I checked my Met- Meta Bank account which I have like all dad's fucking shit going through and I got, I got deposits today… and Diane didn't say anything. Yeah, Diane hasn't said anything. I'm-I'm sure she already checked the books. So, yeah, because like, uh… I got this really thing going on with my CPA. I hooked up like twenty of my ATMs right to his bank account.

D. SILVA: That's right. [talking over Ian SILVA]

D. SILVA: Okay

Ian SILVA: So, instead of us writing checks back and forth, he, uh, he just gives me money. Like I'm abou– I'm gonna pick up like four hundred thousand ($400,000) right now, and throughout the week he is just going to get shut down with the ACH's and uh… Yeah, like because, like she told me today, Diane was like "Yeah, our balance is down to sixty-eight thousand ($68,000)." And we were up to like, I think like three hundred thousand ($300,000) when we went into Friday. So, I'm sure we got- he got the deposits. So.

D. SILVA: Okay, okay. Is there a reason why you do it through him? Like, he, he just never gets shutdown or what?

8

| | | |
|---|---|---|
| 1 | Ian SILVA: | Well, he has Bank of America, John…is unreal what |
| 2 | | the amount of money that he can get. Um… I've |
| 3 | | doing this… It's the CPA I've been talking to you |
| 4 | | about, and like the thing is like, his accounts |
| 5 | | are getting shutdown too when I write checks. |
| 6 | | Because… |
| 7 | D. SILVA: | Okay. [talking over Ian SILVA] |
| 8 | D. SILVA: | Mm |
| 9 | | [call ended] |

25. On November 9, 2020, at 12:02 p.m., agents intercepted an audio phone call between Silva, using the Intercepted Phone and D. Silva, using phone number ending 6969, which continued the above audio conversation.

| | | |
|---|---|---|
| 14 | Ian SILVA: | …but, what were we talking about? |
| 15 | D. SILVA: | oh, the banks… |
| 16 | Ian SILVA: | Bro, this world that I live in, like it's unreal |
| 17 | | there is always like cash all over, I just gotta |
| 18 | | hit up my friends. The people I met over the |
| 19 | | years. Like, and I've been hit up today, like |
| 20 | | I've been hit up twice to go get money. Like him, |
| 21 | | he is like, "I'm sitting on all this freaking |
| 22 | | money, you are gonna come and get it or what?" |
| 23 | | [LAUGHS] You know? And then… |
| 24 | D. SILVA: | And so, look the way he, the way he gets the |
| 25 | | money, it's like your accounts deposit into his |
| 26 | | account, right? |
| 27 | Ian SILVA: | Correct. But we have like… Yeah, we have a legal |
| 28 | | agreement, that's stating that, any money coming |

9

|    |             |                                                                 |
|----|-------------|-----------------------------------------------------------------|
| 1  |             | from these terminal ID's or anything like that is               |
| 2  |             | mine and any profits that are made from this,                   |
| 3  |             | this thing is mine. It's Ian Silva's or SID                     |
| 4  |             | group, IDS, whatever, whatever… …the fuck Diane                 |
| 5  |             | made up [U/I]. SID.                                             |
| 6  | D. SILVA:   | Yeah, yeah, yeah. [talking over Ian SILVA]                      |
| 7  | D. SILVA:   | What, so, how- what's in it for him? What, you                  |
| 8  |             | know is he getting a little piece out of this or                |
| 9  |             | what?                                                           |
| 10 | Ian SILVA:  | Yeah, he still gets the half percent (½) I give                 |
| 11 |             | him.                                                            |
| 12 | D. SILVA:   | Oh, Okay.                                                       |
| 13 | Ian SILVA:  | But it's like, uh, the longevity now. Now, like…                |
| 14 |             | Dude, his accounts are so season. I look- I was                 |
| 15 |             | looking at his accounts like because his are                    |
| 16 |             | connected to Merrill Lynch and everything. He has               |
| 17 |             | like two million ($2,000,000) dollars in his                    |
| 18 |             | Merrill Lynch like, um, stock trade and then he                 |
| 19 |             | has like another million ($1,000,000) in his 401K               |
| 20 |             | and then he has… Dude- dude is wealthy. He's had                |
| 21 |             | his account forever, like Bank of America. Over                 |
| 22 |             | ten years. So nothing's gonna happen and he has                 |
| 23 |             | tons of money going in and out of these accounts,               |
| 24 |             | bro. So instead of him getting his shit shut down               |
| 25 |             | and our shit shut down, 'cause we just lot                      |
| 26 |             | another account. We are losing another account on               |
| 27 |             | the twentieth.                                                  |
| 28 | D. SILVA:   | Okay. Bank account?                                             |

| | | |
|---|---|---|
| 1 | Ian SILVA: | … I've known John for two years, this is like- |
| 2 | | this is like one of Fuzzie's really good friends. |
| 3 | | [BACKGROUND: SIRENS] Like they're really good |
| 4 | | friends and it took a lot of for me to get like, |
| 5 | | you know, this way with him. And this idea just |
| 6 | | popped up like two months ago, bro. 'Cause like, |
| 7 | | he was getting sick of his accounts getting shut |
| 8 | | down. Like I- I kinda screwed him, I'm not gonna |
| 9 | | lie. There was an account that he had that was |
| 10 | | paying him like… like two (2%) percent. |
| 11 | D. SILVA: | Okay. |
| 12 | Ian SILVA: | On- on savings and dude, he had like two million |
| 13 | | ($2,000,000) dollars in it. And because of like |
| 14 | | the in and out, in and out checks it just- it- it |
| 15 | | screwed him… |
| 16 | Ian SILVA: | The- the problem that I have is, is that I don't |
| 17 | | have like a set schedule of how much money is |
| 18 | | gonna come through. What I get from Comerica and |
| 19 | | from my Meta Bank is already taken. Like I need |
| 20 | | more from those account. Like I- I need more. I'm |
| 21 | | going to- The Meta Bank is going into a week that |
| 22 | | they're gonna be closed all next week. |
| 23 | D. SILVA: | What the (expletive)? |
| 24 | Ian SILVA: | And… I am on the week that… I don't need money |
| 25 | | this week but I need money next week. So I'm |
| 26 | | fucking screwed. So I'm like trying to scramble |
| 27 | | and figure out for next week the hundred and |
| 28 | | twenty thousand (120,000) that…that I need. Like |

11

>I'm going through like seven-hundred (700), eight-hundred (800) a week. So, like, ugh! I don't know, bro. Like, I don't know where I can help you, like I don't know if I have room to do it. Because there's some… Like- like right now I'm cool. Because it's the first (1st) of the month. It's right around the first (1st) of the month. They have a lot of things going on. People make rent payments, deposit; whatever. I- I- I can't promise you that, bro. Like, that's… We're tight. Like we're very tight.

*Officers Discover the Defendant Currency During a Stop of Silva*

26. At approximately 11:00 a.m. on November 9, 2020, law enforcement established surveillance at Goldberg's office. At approximately 12:15 p.m., a white BMW M2 with heavily tinted windows parked in the parking lot. The driver remained inside the car. Record checks on the BMW's license plate number indicated that Silva had recently purchased the BMW.

27. At approximately 12:30 p.m., agents observed Silva get out of the BMW carrying a black backpack, which appeared empty and light. Silva entered Goldberg's office. Moments later, Goldberg's vehicle parked in the parking lot. At approximately 12:32 p.m., Goldberg got out of his vehicle carrying a small white box and entered Goldberg's office.

28. At approximately 12:53 p.m., Silva exited Goldberg's office wearing the black backpack, which now appeared full. Silva was carrying a brown grocery bag and a white box. He got into the white BMW M2 and drove away.

29. At approximately 1:02 p.m., Orange County Sheriff's Department officers conducted a traffic stop on Silva's BMW on the Pacific Coast Highway in Huntington Beach. A narcotics detection dog alerted to the odor of narcotics emanating from Silva's BMW. Pursuant to the alert, officers opened the passenger side door and found a Ralph's grocery bag and a white box on the passenger seat. The Ralph's bag contained several bundles of what appeared to be $20 bills grouped in white wrapping paper labeled "$2000." The white box contained several $100 bills wrapped in rubber bands.

30. Silva was read his Miranda rights and agreed to speak to the officers. Silva stated that he had an ATM business, with some of the ATMs located at "marijuana shops." Silva was not arrested and was released.

*Silva Admits to Investigators that his Private ATMs facilitate Sales at Unlawful Marijuana Dispensaries*

31. On or about March 9, 2021, Silva was interviewed by investigators and disclosed the following information, in substance:

a. Silva stated that he is the owner of approximately 30-40 ATMs that he operates under the business name Money Man ATMs. Silva stated that he had been working in the ATM industry for eight years and had been the owner of his ATM business for the past five years.

b. Silva stated that his ATMs are in both legal and illegal/unlicensed marijuana dispensaries, as well as gas stations and tacos shops.

c. Silva stated that he had known Goldberg for three-to-four years. Silva stated that in approximately 2017 or 2018, he confided in Goldberg that he was afraid he was going to lose his ATM

13

business because banks were constantly closing his bank accounts. Silva stated that Goldberg offered to lend Silva cash to use in his ATMs. Silva stated at the time, Goldberg told him that he had a lot of tax clients that paid him in cash and that he would exchange this cash for checks from Silva.

      d.   Silva stated he became aware that the money Goldberg was providing him was coming from marijuana transactions based on the strong odor of marijuana and how the money was bagged and packaged.

      e.   Silva stated that he believed Goldberg was charging his clients "points on the back end" to get their cash from marijuana transactions into the financial system.

      f.   Silva stated he linked his ATMs directly to Goldberg's Bank of America accounts because paying Goldberg in checks was getting Goldberg's accounts closed, and Silva, Evans and Goldberg believed that if Silva's ATMs were linked directly to Goldberg's bank accounts it would arouse less suspicion from the banks. Silva clarified that Goldberg has nothing to do with his business other than providing money for his ATMs and Goldberg does not own a percentage of the company or any of the ATMs.

      g.   Silva stated that when he gets large denomination bills from Goldberg that he cannot use in his ATMs, he exchanges them for smaller denomination bills from others in the narcotics industry, including a man he knows as "Tyler."

      h.   Silva stated that Tyler is the manager for approximately 10-12 unlicensed/illegal marijuana dispensaries and that Silva has his ATMs in many of Tyler's unlicensed dispensaries. Silva stated he routinely exchanges $30,000-$40,000 in large bills for $20 denominations at Tyler's office in Santa Ana, CA. Silva

14

stated that Tyler has been in this location for approximately two years and that he uses it as a base of operations for his unlicensed dispensary network.

  i. Silva also stated that after his accounts at Bank of America were closed, he asked his employee, B.D., to open a business checking account at Bank of America for Silva's use. Silva stated that B.D. agreed to open the accounts for him.

  j. Silva affirmed that B.D. does not have control or access to the Bank of America account. Silva also affirmed that he linked the ATM's that are located at unlicensed marijuana dispensaries to the bank account B.D. opened for him.

*The '5501 and '9165 Accounts*

32. In or about November of 2012, the '5501 Account was opened in the name of Ocean View Accounting, Inc., with Goldberg as the sole signatory.

33. According to California Secretary of State records, Goldberg is the Chief Executive Officer of Ocean View Accounting, Inc., a corporation registered with the State of California that is described as a "law and accounting" business.

34. The '9165 Account is held in the name of Long Beach Auto Detail Inc., with an address in Long Beach, CA, with Goldberg as the identified account holder.

35. The '9165 Account received numerous deposits linked to the ATMs owned by Silva. At least $6,869,450.00 was deposited from Silva's Private ATMs into '9165 Account, from the period of approximately September of 2020 through February of 2021

36. Beginning in or about October of 2020 and continuing through November of 2020, approximately $2,812,541.07 was transferred

15

from the '9165 Account to the '5501 Account. The beginning balance in Bank of America '5501 Account on October 1, 2020 was $12,901.36. During this period, total deposits from all sources into the '5501 Account was $3,660,505.61. Therefore, the transfers from the '9165 Account represent approximately 77% of the total deposits into the '5501 Account.

## FIRST CLAIM FOR RELIEF

37. Based on the foregoing, the government alleges that the Defendant Assets are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because the Defendant Assets were furnished or intended to be furnished in one or more exchanges for a controlled substance or listed chemical, represent or are traceable to proceeds of illegal narcotics trafficking, or were used or intended to be used to facilitate one or more exchanges of a controlled substance or listed chemical, in violation of 21 U.S.C. § 841 *et seq*.

## SECOND CLAIM FOR RELIEF

38. Based on the foregoing, the government alleges that the Defendant Assets constitute property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B) (Concealment Money Laundering), or property traceable to such property, with the specified unlawful activity being violations of 21 U.S.C. § 841. The Defendant Assets are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

//
//
//

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the Defendant Assets;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the Defendant Assets to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: July 26, 2021

TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section


   /s/
DAN G. BOYLE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

VERIFICATION

I, STACY COLE, hereby declare that:

1. I am a Special Agent assigned to the Department of Homeland Security - Homeland Security Investigations ("HSI") and the case agent for the forfeiture matter entitled *United States of America v. $383,960 in U.S. Currency, et al.*

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 24, 2021 in San Bernardino, California.

_____
STACY COLE
Special Agent
HSI